Good morning. Verna Weifold on behalf of Mr. Vargas, the appellant. The two issues in this case, whether or not Mr. Vargas' constitutional rights were violated by the trial court's failure to substitute counsel when he filed all the margin motions, and the issue of whether or not he was deprived of his rights due to a conflict of interest between him and his attorney, the state court's handling of this issue, I think it's, in my opinion, it's crystal clear that the court of appeal decision is both contrary to established Supreme Court authority as well as an objectively unreasonable application of the law, the settled law to the facts. With regard to specific evidence, counsel, is there that because the attorney was afraid of her client, that how did it specifically affect her performance in defending him? What can you point to in the record? With respect to that issue, Your Honor, when she went up and told the court after Mr. Vargas' outburst in front of the jury that she was siding with the prosecution, she went up and told the judge at sidebar that she was afraid of him. She did not explain in any detail whatsoever why specifically she was physically afraid of him, and asked for the taser belt, which the sheriff said wasn't working. Then when she said she would feel okay, well, the judge asked her, can you nevertheless continue representing him? And she said, oh, yeah, no problem. But they go back down after the judge has already examined and polled the jury and says, you know, would this outburst affect you? She goes back and switches her seat away from him. I mean, if I'm on a jury and all of a sudden, if she had sat across the room, but she sat, the interpreter sat in between, and it could well be deemed that that was a more efficient way. Mr. Vargas did not need an interpreter. He's a native speaker of the English language. It was the co-defendant's interpreter that she placed between him. And the jury could not have helped but notice that after this outburst, the lawyer all of a sudden moves away from him, and so she doesn't have to sit next to him. And that clearly impacts on the presumption of prejudice. What do we look for, though? Excuse me, innocence. What do we look for when we – there's no question about what happened and the facts. So what do we look for when we try to decide on appeal whether some relief is due because of that? What's the question we must ask? That is because in his direct appeal, before the court of appeal, Mr. Vargas argued one of his strong arguments was that this movement away from him, making it look as if his own lawyer thought he was so evil she didn't want to sit next to him, argued that this impacted on the presumption of prejudice and cited United States Supreme Court authority, namely Estelle v. Williams. The California court of appeal did not address the presumption of innocence argument at all, ignored it entirely, and characterized it solely as an issue of whether or not he was still able to communicate with his attorney. And I think the other important – How do we – Oh, go ahead. No, I'm sorry. No, no, that's okay. How do we separate that claim of fear? And I guess you're arguing it must have affected her performance. I think that has to be the inference you're arguing. How do we separate that from the outburst that he engaged in in front of the jury where he had to be physically, I guess, restrained or removed from the courtroom? I think that's a very good question. And that all starts with what happened in the very beginning of this case, Your Honor, because it's all linked – the two issues are linked together. In the very beginning of the case, Mr. Vargas filed numerous marks and motions primarily stating that she is refusing, absolutely refusing, to investigate my claim of innocence. He said – Had he said that he gave her the names of the witnesses that he wanted her to contact and interrogate? He had a record regarding that. There was some confusion as to exactly the out – I don't think so. The record makes it pretty clear. When he did it, it was the day before. Well, Your Honor – Can I show that? There – Your Honor, may I explain? Certainly. Yes. First, we have the issue of the fact that he said, and he told the judge, the police officers beat me and planted evidence on me. And she is refusing not only to investigate but to even file a pitches motion, which is to, you know, get the records of the police officers. Do you want to – And California law makes it easy. And you have such limited time, and when you make a point, I think we ought to discuss it just a little bit. The evidence that they planted on him were the clothes that he had on his back and the man's credit cards. And the man said, testified, I saw him with the clothes on. So it was before he had contact with the police. And that's why the defense counsel didn't go into that end of it. So tell us why she was wrong. Because when the witness who was looking for his lost car said he saw the individual with the clothes on, he gave a description of somebody that may or may not have been Mr. Vargas. It is the police who later caught him and said that he had – that this was the guy. So there is some confusion. And even the defense attorney argued during – and cross-examined the witnesses as to the unreliability of the eyewitness identification. Which brings me to the other point about why he was so prejudiced about what happened in her refusal to investigate his claims of innocence. Because what she did was she just made up a defense in closing argument. I mean, either the police's version of the facts was correct, or his version of the facts was correct, that they planted the evidence on him and they beat him. But there was absolutely no evidence before the jury to support the closing argument that she gave, which she wanted to sort of have her cake and eat it too, which is that he just happened to be walking by. I'm still waiting for an answer to my question. Oh, I'm sorry. The question was how do we separate the prejudice from his outburst versus your claim of prejudice from the fact that the attorney switched chairs? I got sidetracked, Your Honor. I apologize. That's why I reminded you. We can't separate it because you can imagine how upset and enraged a defendant would be starting, you know, going into this trial with repeated refusals of his attorney to do what he asked and the court upholding it. So he was upset, understandably, and he has an outburst. There are all kinds of defendants that have outbursts in the courtroom. If there had been, if he really was that violent and that dangerous, the sheriff certainly would have been ordered to make other arrangements. And even the court of appeals decision said there wasn't any basis for the use of a taser belt. But that's not my concern. My concern is I accept as a given that fear is an unwelcome but often present companion in trials, particularly involving crimes of violence. The question I'm struggling with is how did this, I'll call it, attitude of fear that you say the defense counsel carried, adversely affect her performance as a defense lawyer in representing your client before the jury? It adversely affected her performance in that had she really, if her fear was genuine, she had a duty to seek to be removed because knowing that the remedy for her fear was to move away from him and place the interpreter for the co-defendant in between them so that the jury would then see she was no longer sitting next to him, that did adversely affect her performance. Wouldn't that require us then to announce a new rule of law that any time any participant, whether it be the judge, a lawyer, a witness, or a juror, has some apprehension based upon the nature of the case before him, we presume reversible error and prejudice from that fact alone. Doesn't the law require more than that? Your Honor, the law does not necessarily presume prejudice any time a defendant says, you know, make some ruckus in the courtroom. I mean, obviously, you know, we're not, we're not, I'm not asking that. But in the context of this particular case, it was clear that her performance was not based upon an adequate investigation and that the defendant was understandably upset. The court of appeal agreed that there was no other evidence in the record that he was otherwise a threat, a physical threat to anybody else, and that when this happened, under the facts of this particular case, she had a duty to seek to be removed at that point because knowing what had happened in front of the jury, her moving away from him would prejudice him, and it did impact on the presumption of prejudice. Do you want to reserve time? I'm just about out of time. Thank you. All right. Let's hear argument from Ms. Brody. Good morning, Your Honors. Anna Lee Brody on behalf of Respondent. And in this case, the Petitioner has not rebutted by clear and convincing evidence the factual findings made by the State courts and then were adopted by the District Court. The best Petitioner can ask is for this Court to just draw different inferences from the record than the California Court of Appeal did. And the District Court agreed with those inferences and found them supported by the record. For example, the specific evidence that her – that the counsel's performance was affected, there isn't any. To the contrary, she did a great job. She ably defended this man against a mountain of incriminating evidence. She made objections. She cross-examined witnesses. She – it's clear that she spoke to him at some point. And throughout the trial, she asked for a – made sure that the Court ordered a phone call and a shower for the defendant. And to the extent that the facts showed that she moved – had a slight reshuffling of seats at a small, crowded table, I think if that's – to the extent that's ambiguous, the deferential standard review says it's not enough for Petitioner to offer a different view of that evidence. Should it make any difference to us as we review the case that she also felt he was guilty of sin and should not go to trial, that anybody would go to trial on these facts would be crazy. He should have worked out some arrangement. And the record shows that. Sure. It's often the case. So does that get on the scale in any way? No. I think, Your Honor, the – and many cases say this. Morris v. Slappy, he's – you're not entitled – he is not entitled to a – to a counsel – to a defense counsel who thinks he's innocent, who thinks – who likes him and thinks he's nice. No. She ably defended him. There's no evidence to the contrary. And her fear – she repeatedly assured the Court that her fear never hampered her ability to – to defend him. And, of course, the question we're looking at under – is it Kuhler v. Sullivan? I'm not sure how to pronounce that – is whether there was an actual conflict and, of course, whether that conflict adversely affected performance. I think neither of those is met here. There was no actual conflict. It was resolved. It was – she had concerns that were reasonable. You would concede that there was a conflict? I wouldn't – not a conflict that – not a conflict in the sense that there was a breakdown of communication, an utter breakdown. I mean, they clearly got – well, you might think it is. I mean, it's a pretty unusual situation when defense counsel asks the trial court to put a taser belt on her client. Yeah. The taser belt didn't happen, of course, as we know, but – Because there was no belt available, not because she didn't ask for it. She did ask. She was afraid. She said she was afraid, but – Okay. So the question is can we presume from that fact, as I think Ms. Viefald urges, that there was a conflict between defense counsel and her client? I wouldn't say. I still would maintain that it was more – as the court of appeals said, she was reasonably concerned about her security. She wasn't – there was not a conflict. I hate to use the word conflict because she was able to talk to him, sit at the same table. This is a crowded table. If she truly felt he was dangerous, I think, like you said, she might be across the room. But from what little I could glean from the record, it didn't look like the courtroom was very big. I'm not sure there would have been any place for her to go other than, you know, sitting next to the prosecutor. Well, that is true. And if he were truly dangerous, he probably wouldn't be sitting next to anyone. But here he was at a crowded table next to the interpreter, next to the co-defendant, other attorneys. It's a – they shuffled over the lunch break. I'm not sure. I guess that we assume the jurors noticed, but I'm not sure that they would even notice that he – that she changed places. It could be for convenience. It could be to facilitate communication. Yeah, to facilitate communication, let alone get away from him. But she said my fear was never great enough where I was – I could not represent him – his interest to the fullest. As far as the conflict, I think there was more disagreement over tactical decisions, over the pitches motions, over the various things that were discussed in the margin context. But that was – the fact that they were disagreeing shows they were communicating and continued to communicate. Excuse me, counsel. He clearly was frustrated and she was frustrated with him, although he did communicate in part when he didn't reveal the names of the witnesses until later and so forth because he kept saying she won't listen to me, I want another lawyer, et cetera, et cetera. So there was a failure of communication in part in the sense that neither felt comfortable with the other. But is this sufficient, then, to claim ineffective assistance is the real question? No, Your Honor, it's not, especially when it's unilateral. I think when it's initiated and fed by a defendant who's trying to derail his trial. It's clear throughout the record that he was manipulating the proceedings. The district court found that he abused the Feretta motion. He was trying to delay trial in another context with self-representation. This is just the – it colored the whole trial. He is trying to throw a monkey wrench into his inevitable conviction. Well, the other question that rose in my mind, she was a public defender when she said, of course, she was scared to death of him, but of course I can defend him. Was she really worried about her job if she failed to defend him? And was that the reason she persisted? She clearly didn't want to be near him, didn't want to be associated with him except to try to represent him. Was there another element here that should be considered by the court? I don't think there's any evidence of that. I think that fear of one's client is something that public – all public defenders experience, I'm sure, at some point. And she even said after the seats were rearranged, her fear was gone. She was no longer afraid. And if that's all it takes is moving, you know, 6 inches away at a crowded table, then I don't think the fear was very great to begin with. If she took reasonable precautions and she had reasonable concerns, but I don't believe there's any evidence that she thought her job would be compromised or her professional reputation. I think what was more, I think she defended him well and was an experienced and capable attorney. Well, Your Honors, I would just respectfully ask that the judgment be affirmed. Do you have any questions? I don't think we have anything else. Thank you, Ms. Brody. Thank you. Ms. Vifal. 30 seconds left. All right, go ahead. I'll give you a minute. I know there's some concern about the dispute between Mr. Vargas and the lawyer as to the names of the witnesses that she was supposed to contact and whether she could contact them or not. But one thing we do have in this, we have the dispute between, you know, who's telling the truth. But one thing we do have is that this attorney made up a defense in closing argument. And public defenders, I was myself one, you often have to, your closing arguments many times are, you're hoping your face isn't turning purple when you're arguing. But you don't make up something that's just not there as a means of defending your clients. I have nothing else. Thank you. Thank you both. The case just argued is submitted. And we will hear argument in the case of the United States.
judges: Farris, D.W. Nelson, Tallman